## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEREMY J. WILKINSON,** | : | |
| **Plaintiff** | | |
| **v.** | : | **CIVIL ACTION NO. 3:CV-06-110** |
| | | |
| **JO ANNE B. BARNHART,** | : | **(MUNLEY, D.J.)** |
| **Commissioner of** | | **(MANNION, M.J.)** |
| **Social Security** | : | |
| **Defendant** | | |

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence to support the Commissioner's decision denying the Plaintiff's claims for Disability Insurance Benefits, ("DIB"), and Supplemental Security Income, ("SSI"), under Titles II and XVI of the Social Security Act, ("Act").  42 U.S.C. §§ 401-433, 1381-1383f.

## I.  PROCEDURAL HISTORY.

The Plaintiff filed applications for DIB and SSI on July 18, 2003, alleging disability since December 22, 2002, due to mental illness and deterioration in the neck. (TR. 38, 54, 202). The state agency denied his claims initially on October 29, 2003. (TR. 27-30). The Plaintiff filed a timely request for a hearing (TR. 31), and a hearing was held before an Administrative Law Judge (ALJ) on April 18, 2005. (TR. 228-284). The Plaintiff, Plaintiff's mother, and a vocational expert (VE) testified at the hearing. (TR. 239-284). The Plaintiff was denied benefits pursuant to the ALJ's decision of August 9, 2005. (TR. 14-23).

The Plaintiff requested review of the ALJ's decision. (TR. 12). The Appeals Council denied his request on November 19, 2005, thereby making

the ALJ's decision the final decision of the Commissioner. (TR. 4-6). 42 U.S.C. § 405(g). That decision is the subject of this appeal.

In compliance with the Procedural Order issued in this matter, the parties have filed briefs in support of their respective positions. (Docs. 9 and 10).

## II. STANDARD OF REVIEW.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3rd Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999). It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job

vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

## III. ELIGIBILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520 (2004). *See also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. 20 C.F.R. § 404.1520.

The first step of the process requires the Plaintiff to establish that he has not engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(b). The second step involves an evaluation of whether the Plaintiff has a severe impairment. *See* 20 C.F.R. § 404.1520(c). The Commissioner must then determine whether the Plaintiff's impairment or combination of impairments meets or equals those listed in Appendix 1, Subpart P, Regulations No. 4. 20 C.F.R. § 404.1520(d).

If it is determined that the Plaintiff's impairment does not meet or equal a listed impairment, the Commissioner must continue with the sequential evaluation process and consider whether the Plaintiff establishes that he is unable to perform his past relevant work. 20 C.F.R. §§404.1520(e)-(f). The Plaintiff bears the burden of demonstrating an inability to return to his past relevant work. *Plummer*, 186 F.3d at 428. Then the burden of proceeding shifts to the Commissioner to demonstrate that other jobs exist in significant numbers in the national economy that the Plaintiff is able to perform,

3

consistent with his medically determinable impairments, functional limitations, age, education and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c). This is Step Five, and at this step, the Commissioner is to consider the Plaintiff's stated vocational factors. *Id.*

Here, the ALJ proceeded through each step of the sequential evaluation process and concluded that the Plaintiff was not disabled within the meaning of the Act. (TR. 17-22). At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful work activity since his alleged disability onset date, December 22, 2002. (TR. 18). At step two, the ALJ concluded that the Plaintiff's psychosis, bipolar disorder, chronic obstructive pulmonary disease, and substance abuse were severe within the meaning of the Regulations. (TR. 18-20).

At step three, the ALJ found that Plaintiff's severe impairments were not severe enough to meet or equal, either singly or in combination, the criteria for establishing disability under the listed impairments as set forth in Appendix 1, Subpart P, Regulations No. 4. (TR. 20). The ALJ paid particular attention to Sections 3.02 *et seq.*, 12.03, 12.04, 12.08 and 12.09 of Appendix 1, but found that Plaintiff failed to meet the listing requirements. (TR. 20). 20 C.F.R Part 404, Subpart P, Appendix 1, Listings 3.02, 3.03, 12.03, 12.04, 12.08, 12.09.

At step four, the ALJ found that the Plaintiff was able to perform his past relevant work as a wire finisher. (TR. 21). At step five, the ALJ found that the Plaintiff had the residual functional capacity (RFC) to perform a range of unskilled medium to light work. (TR. 21). The ALJ found that a significant number of jobs exist in the regional and national economy which the Plaintiff could perform. (TR. 21). Thus, the ALJ concluded that the Plaintiff was not disabled within the meaning of the Act. (TR. 21-22). 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## IV.  BACKGROUND.

### A.  Factual Background.

The Plaintiff, thirty years old at the time of the ALJ's decision, was considered a younger individual under the Regulations. (TR. 239). 20 C.F.R. §§ 404.1563 and 416.963. Plaintiff has a high school education, receiving a general equivalency diploma ("GED"). (TR. 60, 240). The relevant time period for this case is December 22, 2002, the date of onset, through August 9, 2005, the date of the ALJ's decision.

Plaintiff worked as a wire finisher, laborer and mechanic. (TR. 246-249, 277). Plaintiff was fired on December 22, 2002 and he collected unemployment insurance benefits for six months. (TR. 242, 253). Plaintiff testified that if he was not fired, he could have kept working at that job. (TR. 243). He testified that he is working towards being able to work at a similar job to the one he was fired from, with better benefits and a better salary. (TR. 243). Plaintiff testified that he wants to work and does not want to be disabled for the rest of his life. (TR. 253). He stated, "[i]f someone offered me a job, I'd have to go for it." (TR. 253). Plaintiff further believed he could do the job and could be at work regularly. (TR. 253, 265).

The ALJ asked Plaintiff, "if someone offered you a pretty easy job now and had good pay and good benefits, and let's assume it was pretty close to where you live so it wasn't a long commute. Do you think you could do a job that was pretty easy and didn't require a whole lot of effort, or contact with people?" (TR. 263-264). Plaintiff responded, "[y]eah," reiterating that he does not want to be disabled forever. (TR. 264). He also stated that he thinks he could do a job that dealt with the public, answering questions and talking to people. (TR. 264). Plaintiff stated, "[t]he only reason I'm here today is to hopefully get Social Security from the time I became disabled until now, just to make me whole so I could pay back some of the things that I owe, to get

5

on my feet, to get another car so I can drive to work, and to become a normal person again." (TR. 264-265).

Plaintiff also testified that he could probably say he was not disabled at the time of the ALJ hearing and in the upcoming days, months and years. (TR. 265). Plaintiff also believed Dr. Symes would agree that he should attempt to return to work. (TR. 265). Plaintiff stated he was better because he went through counseling, therapy, treated with doctors, attended church consistently for two years and sings in the choir, and focused on making himself whole again. (TR. 265).

Plaintiff testified that his self-confidence keeps him from working, as well as his mental and physical disability. (TR. 240-241, 243). He stated that his mental impairments include acute anxiety, severe depression, night tremors, night sweats, and nightmares. (TR. 241). His physical impairments include back impairments and severe asthma. (TR. 241). Plaintiff takes Ativan for anxiety, and Trazodone for sleeping difficulties. (TR. 257). He stated that the medications help stabilize his anxiety and depression. (TR. 257-258). Plaintiff testified that he is not sure if his back problems would preclude him from working, but his asthma may preclude him from working. (TR. 241). He stated that so long as he keeps his asthma in control, he believes he could work, unless he was fired due to illness. (TR. 243). Plaintiff also testified that he could try to work at his previous job as a mechanic, though he was not one-hundred percent sure he would be able to do it because of his loss of self-confidence. (TR. 251-252).

Plaintiff takes medication, inhalers and Prednisone to treat his asthma. (TR. 243). Plaintiff believes the Prednisone may affect his mental state, however he has never discussed this possibility with a doctor and he is not sure his doctor even knew he was on the medication. (TR. 244-245). Plaintiff does not treat with an asthma specialist, he goes to the emergency room for

treatment when necessary. (TR. 244, 252). He stated that the medications generally do not affect his ability to drive or concentrate. (TR. 263).

During the day, Plaintiff takes care of his children. (TR. 258). He prepares them for school, helps them with homework, prepares meals, and keeps them out of trouble. (TR. 258-259). He stated that he plays games with the children, either running around outside throwing balls or playing board games. (TR. 262). Plaintiff testified that he cleans the house, but does not usually go to the bank, post office, or grocery store because he does not like to be out due to his depression. (TR. 258-259). Plaintiff stated that when his children are not at home he becomes depressed, if he has something to keep him busy he is generally okay. (TR. 258).

Plaintiff and his mother testified that Plaintiff has no problem getting along with people, except for some family members. (TR. 251, 261). Plaintiff goes to church and sings in the choir. (TR. 261). Plaintiff is able to take "really good care" of himself. (TR. 261).

Plaintiff used methamphetamines in the past, over the course of a year. (TR. 241, 260). He last used the drug two and a half years before the ALJ hearing. (TR. 241). Plaintiff believes he experiences residual psychological affects from the drug. (TR. 260).

A vocational expert, Marianne Starosta, testified at the ALJ hearing. (TR. 271).  Plaintiff's work as a laborer was classified as unskilled work in the heavy to very heavy physical exertional level. (TR. 277). His work as a mechanic was classified as semi-skilled work (with a mechanic's skill) in the heavy duty physical exertional level. (TR. 277). he wire finisher work was classified as unskilled work in the medium duty physical exertional level. (TR. 277).

The ALJ asked the VE to hypothetically consider an individual with the same age, education and work background as Plaintiff with a history of

substance abuse, long-term treatment for asthma, treatment for depression and anxiety, the need to be in a relatively clean air environment, and would be limited to unskilled work with low to moderate concentration levels and limited public contact. (TR. 277-278). The hypothetical individual could occasionally lift twenty to fifty pounds; could be on his feet for six hours in an eight-hour day; could sit for six hours in an eight-hour day; would not deal with members of the public; and would do unskilled work with low to moderate concentration required. (TR. 277-278). The VE testified that such an individual could perform unskilled, medium work in the regional or national economy. (TR. 278). The VE identified available jobs in this category such as a groundskeeper; a stock clerk; and helper for a painter, electrician, plumber or appliance delivery person. (TR. 278-279). All of these jobs would have over 1,000 positions available in Northeastern Pennsylvania. (TR. 279). The VE testified that Plaintiff's asthma may affect his ability to perform work as a groundskeeper or painter. (TR. 279).

The VE then testified that such an individual could perform unskilled, light work in the regional or national economy. (TR. 279). The VE identified such work as a hand packager with over 1,500 available jobs; a hand assembler with over 1,800 available jobs; and an inspector or security monitor with 1,500 available jobs together. (TR. 279-280). The VE testified that an individual would probably not be employable if they consistently missed two to three days of work per month. (TR. 280). The VE stated that if the Plaintiff's testimony were accepted, he would not be able to perform the aforementioned jobs. (TR. 280-281).

### B. Medical Background.

Plaintiff began treating with psychiatrist Dilwyn Symes, M.D., in 2003. (TR. 173-187). Dr. Symes completed an Employability Assessment Form on July 5, 2003, concluding that Plaintiff was temporarily disabled for less than

twelve months. (TR. 113-114). Dr. Symes diagnosed psychosis and opined that Plaintiff became disabled on July 3, 2003, and he expected the disability to last until January 2, 2004. (TR. 114). Dr. Symes based this assessment on a review of Plaintiff's medical records and clinical history, not on physical examination. (TR. 114). On December 9, 2003, Dr. Symes completed an Employability Re-Assessment Form. (TR. 167-168). Based on Plaintiff's clinical history, Dr. Symes again concluded that Plaintiff was temporarily disabled for a period of less than twelve months. (TR. 168). He diagnosed depression and opined that Plaintiff's disability began on December 9, 2003, and he expected the disability to last until December 8, 2004. (TR. 168).

Plaintiff complained to Dr. Symes of anxiety, depression, sleeplessness,(TR. 183, 186, 224, 225). In May 2003, Plaintiff reported he was attending nursing school. (TR. 111, 221). In July 2003, Dr. Symes noted that Plaintiff was mentally and emotionally stable and suffered from severe akathisia[1]. (TR. 185). Dr. Symes altered Plaintiff's medication to decrease the akathisia. In September and October 2003 and January, May and September 2004, Dr. Symes noted that Plaintiff was stable. (TR. 174-175, 178, 180-181). In December 2004, Plaintiff reported that he was not receiving SSI, and he was in a desperate situation regarding money. (TR. 225). He stated that he was "cautiously optimistic" that he would be rehired by a previous employer. (TR. 225).

On May 9, 2003, Plaintiff was involuntarily committed to the hospital for psychiatric treatment and was treated by Jay P. Shah, M.D. (TR. 137). Plaintiff tested positive for amphetamines and cannabinoids and admitted

---

[1]

Motor restlessness, intolerance of activity. This symptom may appear as a side effect of antipsychotic drug therapy. Taber's Cyclopedic Medical Dictionary 64 (20th Ed. 2005).

that he used methamphetamine and crystal meth. (TR. 134, 137). Plaintiff reported to Marc A. Greenwald, M.D., that he has "increasing stress and depression because he is laid off from his job, and he has not been called back after the winter months." (TR. 135). Upon discharge on May 15, 2003, Dr. Shah diagnosed substance-induced psychotic disorder; amphetamine abuse; cannabis abuse; he ruled our bipolar mood disorder; and assessed a Global Assessment of Functioning ("GAF") score of 50.[2] (TR. 131).

On June 11, 2003, Plaintiff was admitted to the hospital for confusion, agitation, and homicidal and suicidal thoughts. (TR. 117, 121). William E. Kirk, M.D., diagnosed bipolar disorder and assessed a GAF score of 20 on admission.[3] (TR. 121-122). Samuel Shattan, M.D., evaluated Plaintiff on discharge on June 19, 2003. (TR. 117-118). Dr. Shattan diagnosed bipolar disorder and assessed a GAF score of 30 on discharge.[4] (TR. 117).

───────────────

[2]

A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 1994) ("DSM-IV").

[3]

A GAF score of 11-20 indicates some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute). DSM-IV, 32 (4th ed. 1994).

[4]

A GAF score of 21-30 indicates that behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost

Jon R. Grigg, M.D., treated Plaintiff when he was admitted to the hospital on May 26, 2003. (TR. 94-98). Dr. Grigg diagnosed probable paranoid schizophrenia; stimulant dependence, cocaine and amphetamines; marijuana dependence; deferred, though probable personality disorder; asthma; and assessed a GAF score of 25. (TR. 97). Plaintiff was discharged June 5, 2003 and Dr. Grigg diagnosed stimulant induced psychotic disorder, improved; stimulant dependence, amphetamines and cocaine; marijuana dependence; probable personality disorder; and a GAF score of 40 at discharge.[5] Plaintiff felt that he returned to his appropriate baseline and agreed to engage in intensive outpatient care and abstain from illicit substances.  (TR. 94-95).

Plaintiff treated with chiropractor Eric Etka, M.D., in June 2003 complaining of pain in his middle back. (TR. 99-102). Oliver Finch, M.D., submitted a Disability Determination Division Medical Consultant's Case Analysis on October 13, 2003 evaluating Plaintiff's claim of deterioration of the neck.  (TR. 166). Dr. Finch noted that Plaintiff's only treatment for his neck pain was with a chiropractor and Plaintiff later reported that his neck was no longer a problem. (TR. 166). He opined that Plaintiff had minimal physical impairment. (TR. 166).

---

all areas (e.g., stays in bed all day; no job, home, or friends). DSM-IV, 32 (4th ed. 1994).

[5]

A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). DSM-IV, 32 (4th ed. 1994).

Plaintiff underwent a consultative examination with Joseph Cama, M.D., on September 24, 2003. (TR. 162-164). Plaintiff complained of neck pain, depression, anxiety, and psychosis. (TR. 162). Dr. Cama found that Plaintiff's neck pain was a transient phenomena and he did not believe it needed to be looked into further. (TR. 164). Plaintiff reported that his psychosis was directly related to the use of methamphetamines, but it lasted only for a short time after he stopped using the drugs. (TR. 162, 164). Dr. Cama noted that Plaintiff was completely mentally competent during the examination.(TR. 163). Plaintiff reported to Dr. Cama, "if he had the opportunity to work right now [ ] he would." (TR. 163). Dr. Cama noted that Plaintiff did not complain of aches and pains, and he never complained of problems lifting, gra(bb)ing, bending, standing, or walking. (TR. 163).

### C. State-agency physician's report.

John D. Chiampi, Ph.D., a State-agency psychologist, reviewed Plaintiff's medical records in September 2003. (TR. 144-157). Dr. Chiampi completed a Psychiatric Review Technique Form and concluded that a RFC Assessment was necessary based upon schizophrenia, paranoid and other psychotic disorders; personality disorders; and substance addiction disorders. (TR. 144).

Dr. Chiampi evaluated Plaintiff's condition under the requirements of Listing 12.03 (Schizophrenia, Paranoid and other Psychotic Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Addictions Disorders). The Supreme Court has held that a claimant must prove that his condition meets every criteria in a listing before he can be considered disabled *per se*. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

To meet the criteria for Listings 12.03 and 12.08, Plaintiff had to prove that the symptoms described in (A) result in at least two of the following:

1. Marked restriction of activities of daily living; or

12

2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, Listings 12.03, 12.08. Dr. Chiampi found there were moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Chiampi found there were one or two episodes of decompensation, each of extended duration. (TR. 154).

To meet the severity requirement of Listing 12.03 Plaintiff could also prove that he met the requirements of Listing 12.03(C), which are:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.03(C). As noted, Dr. Chiampi found there were one or two episodes of decompensation, each of extended duration, however this was likely due to Plaintiff's self-induced psychoses. (TR. 146). This does not meet Listing 12.03(C)(1) because there are no "repeated episodes of decompensation, each of extended duration." Dr. Chiampi specifically found that the Plaintiff's mental impairments were not severe and did not meet Listing 12.03 (C). (TR. 155). The Plaintiff offered no expert medical opinion to counter Dr. Chiampi's findings. It appears that there is substantial evidence to support the ALJ's conclusion that the Plaintiff

13

has not met the requirements for Listing 12.03.

As stated, Listing 12.08 requires the Plaintiff to prove that the symptoms described in (A) result in at least two of the (B) criteria.  20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.08. Dr. Chiampi found there were inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress, evidenced by persistent disturbances of mood or affect, and pathological dependence, passivity, or aggressivity. (TR. 151). 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.08 (A)(4) and (5). While Plaintiff may have met the (A) criteria, he failed to meet the (B) criteria requirements.

Listing 12.09 requires the Plaintiff to prove any one of the following:

1. Organic mental disorders
2. Depressive syndrome
3. Anxiety disorders
4. Personality disorders
5. Peripheral neuropathies
6. Liver damage
7. Gastritis
8. Pancreatitis
9. Seizures

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.09. Dr. Chiampi found there were behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system, evaluated under Listing 12.08, Personality disorders. (TR. 152). 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.09. However, he also found there was a medically determinable impairment present that does not precisely satisfy the diagnostic criteria of Listing 12.09. (TR. 152).

It is the claimant's burden to prove that his condition meets or equals the specific clinical requirements of a listed impairment, such as Listings 12.03, 12.08 and 12.09, before he can be considered to be disabled *per se*

without consideration of vocational factors, such as age, education, and work experience. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988) (citations omitted). To be entitled to disability benefits, a claimant must show that all, not just some, of the criteria for a listing are met. *Zebley*, 493 U.S. at 530. The Commissioner must make the legal determination as to whether an impairment meets or equals a listing. *See* 20 C.F.R. § 404.1527(e)(1) and (2). There appears to be substantial evidence to support the ALJ's finding that the Plaintiff was not suffering from a listed impairment at any time through the date of the ALJ's decision. (TR. 20, 22).

A State-agency psychiatrist reviewed Plaintiff's records in September 2003 and completed a Mental Residual Functional Capacity (RFC) Assessment. (TR. 158-161). The doctor only found moderate limitations in some of Plaintiff's activities[6] and no significant limitations in a few of Plaintiff's

---

[6]

   Plaintiff was moderately limited in the following categories: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting from them or exhibiting behavioral extremes; ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; ability to respond appropriately to changes in the work setting; ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others. (TR. 158-159).

activities.[7] The psychiatrist also noted that Plaintiff was diagnosed with stimulant-induced psychosis. (TR. 160).

## V.  DISCUSSION.

The Plaintiff contends that the ALJ erred in: (1) failing to give special significance to the opinions of the treating doctors; (2) failing to present a hypothetical question to the vocational expert that identified all of the Plaintiff's impairments and limitations as indicated by the record; and (3) failing to properly address the testimony of the Plaintiff regarding his usual daily activities.  (Doc. 9 at 9-10).

### A. Whether the ALJ erred in failing to give special significance to the opinions of the treating doctors.

The Plaintiff argues that the ALJ did not properly evaluate the opinions of Drs. Symes, Grigg, Kirk, Shattan, Shah and Harris. (Doc. 9 at 10). The Third Circuit set forth the standard for evaluating the opinion of a treating physician in *Morales v. Apfel*, 225 F.3d 310  (3d Cir. 2000). The Court stated:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer v.  Apfel*, 186 F.3d 422, 429 (3d Cir.1999)]

---

[7]

Plaintiff had no significant limitations in the following categories: the ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to sustain an ordinary routine without special supervision; the ability to make simple work-related decisions; the ability to ask simple questions or request assistance; the ability to be aware of normal hazards and take appropriate precautions. (TR. 158-159).

(quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones*, 954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585. Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. *See Adorno*, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent v. Schweiker*, 710 F.2d 110, 115.

*Id*. at 317-18. The ALJ is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(d). Although she must consider all medical opinions, the better an explanation a source provides for an opinion, particularly through medical signs and laboratory findings, the more weight [the ALJ] will give that opinion. 20 C.F.R. § 404.1527(d)(3). While treating physicians' opinions may be given more weight, there must be relevant evidence to support the opinion. 20 C.F.R. § 404.1527(d). Automatic adoption of the opinion of the treating physician is not required. *See Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).

Despite the Plaintiff's complaints of disability, he testified that he was applying for jobs and believed he could work. (TR. 253). Plaintiff contends that the ALJ erred in failing to give controlling weight to Dr. Symes' opinion

that Plaintiff was disabled. Dr. Symes completed two Employability Assessment Forms in 2003 and concluded that Plaintiff was temporarily disabled until December 8, 2004. (TR. 113-114, 167-168). At the ALJ hearing in 2005, Plaintiff testified that Dr. Symes would probably agree with him that he was not disabled at that time and should attempt to return to work. (TR. 265). Plaintiff testified that lack of self-confidence mainly kept him from working, though he also complained of mental and physical impairments. Plaintiff testified that he sent out a job application just one week before the ALJ hearing and he stated that his biggest obstacle is getting employers to give him a chance. (TR. 266).

Plaintiff also argues that the ALJ should have granted more weight to the opinions of Drs. Shah, Grigg, Kirk, and Shattan that Plaintiff had low GAF scores. (Doc. 9 at 11). However, we note that all of the GAF scores assessed by the above doctors occurred during Plaintiff's hospital stays for psychiatric evaluation when Plaintiff was admittedly using methamphetamines. Many of the diagnoses by these doctors were substance-induced diagnoses. Further, the ALJ states in her opinion "[t]he medical evidence indicates that for a few months after May 2003 the claimant has had psychosis (self-induced by methamphetamines)", thus precluding his ability to work. (TR. 19). Dr. Cama assessed that the Plaintiff's psychosis lasted for only a short time after he stopped methamphetamine use. (TR. 164). Plaintiff himself testified that he was not able to work in the past, but he has worked on improving his condition and at the time of the ALJ hearing he believed he could work. (TR. 264-265).

Plaintiff lastly alleges that the ALJ erred by not giving controlling weight to the opinion of Marc Harris, D.O. (Doc. 9 at 9). However, Plaintiff fails to offer an argument pertaining to Dr. Harris' opinion. Dr. Harris treated Plaintiff

18

upon his involuntary admission to the hospital on June 11, 2003. (TR. 123-124). Dr. Harris noted agitation with flight of ideas and paranoid behavior and alleged homicidal/suicidal ideation. (TR. 124).

Although an ALJ may not reject outright the opinion of a treating physician on his own credibility judgment, here, the ALJ did no such thing. *Plummer*, 186 F.3d at 429. As discussed above, the ALJ found that the Plaintiff's psychosis, bipolar disorder, chronic obstructive pulmonary disease, and substance abuse were severe impairments, but not severe enough to meet or equal the criteria for establishing disability under the Regulations. The ALJ noted that many of Plaintiff's psychotic episodes were self-induced by ingesting mind-altering substances and there was no consistent treatment for Plaintiff's bipolar disorder.(TR. 20).Therefore it appears that the ALJ gave substantial weight to the opinions of the treating doctors and did not err in finding the Plaintiff not disabled.

### *B.   Whether the ALJ erred in failing to present a hypothetical question to the vocational expert that identified all of the Plaintiff's impairments and limitations as indicated by the record.*

The Plaintiff argues that the hypothetical question the ALJ posed to the VE did not accurately represent his condition. (Doc. 9 at 12-13). Because the ALJ found that the Plaintiff could perform his past relevant work, a finding of not disabled is appropriate. *See Smith v. Barnhart*, 2003 WL 22862663 at *1. (N.D.Cal. Dec. 2, 2003). Because there was a finding of not disabled, review need not proceed any further. 20 C.F.R. §§ 404.1520, 416.920 (2004). However, The ALJ proceeded to the fifth step of the sequential evaluation process, though not necessary.

The Plaintiff argues that although the hypothetical question included Plaintiff's depression and anxiety, it did not include Plaintiff's schizophrenia,

bipolar disorder or low GAF scores. A hypothetical question must include all of a claimant's impairments which are supported by the record; one which omits limitations is defective and the answer thereto cannot constitute substantial evidence to support denial of a claim. *Ramirez v. Barnhart*, 372 F.3d 546, 553-55 (3d Cir. 2004); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987); *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). When forming her hypothetical questions, the ALJ included the impairments established by the record. The ALJ asked the VE to hypothetically consider an individual with a history of substance abuse, long-term treatment for asthma, treatment for depression and anxiety, the need to be in a relatively clean air environment, and would be limited to unskilled work with low to moderate concentration levels and limited public contact. (TR. 277-278). Plaintiff's low GAF scores occurred during Plaintiff's hospital stays for psychiatric evaluation when he was admittedly using methamphetamines. The ALJ acknowledged that "for a few months after May 2003 the claimant has had psychosis (self-induced by methamphetamines)", thus precluding his ability to work. (TR. 19). However, the medical evidence reveals that Plaintiff's psychosis lasted for only a short time after he stopped methamphetamine use. (TR. 164). Also, as defendant points out in his brief, schizophrenia and bipolar disorder are impairments, not functional limitations. (Doc. 10 at 16).

Therefore, the ALJ did not err in creating her hypothetical question and the resulting question included all of the Plaintiff's limitations as supported by the record. *See Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). When an ALJ's hypothetical question to a VE sets forth the Plaintiff's limitations, as supported by the record, the VE's response may be accepted as substantial evidence in support of the ALJ's determination that the Plaintiff

is not disabled. *Id*. The VE's response to the question, identifying a significant number of unskilled medium to light jobs the Plaintiff could perform, constitutes substantial evidence in support of the ALJ's determination that the Plaintiff was not disabled under the Act.

### C.   Whether the ALJ erred in failing to properly address the testimony of the Plaintiff regarding his usual daily activities.

The Plaintiff argues that the ALJ erred in ignoring Plaintiff's testimony regarding his daily activities.  (Doc. 9 at 13-15).  However, the ALJ did not ignore Plaintiff's testimony regarding her daily activities.  Rather, the ALJ considered such testimony but ultimately concluded that Plaintiff was not entirely credible.  In finding the Plaintiff not entirely credible, the ALJ relied on the Plaintiff's allegations regarding his limitations and his medical records. (TR. 20-22). The ALJ pointed to medical evidence that contradicted the Plaintiff's claims about the extent of his limitations.  (TR. 20-21).  *See Mason*, 994 F.2d at 1067-68 (noting that a Plaintiff's subjective complaints of pain should be given "great weight" unless contradictory medical evidence exists).

Plaintiff testified that he takes care of his children.  (TR. 258).  He sees them off to school, helps them with homework, prepares meals, and keeps them out of trouble. (TR. 258-259). He stated that he plays games with the children, either running around outside throwing balls to each other or playing board games. (TR. 262). Plaintiff testified that he cleans the house, but does not usually go to the bank, post office, or grocery store because he does not like to be out due to his depression. (TR. 258-259). Plaintiff stated that when his children are not at home he becomes depressed, he generally is okay if he has something to keep him busy. (TR. 258).

At the ALJ hearing, Plaintiff stated he was better because he underwent counseling and therapy, treated with doctors, attended church

consistently for two years and sings in the choir, and focused on making himself whole again. (TR. 265). He stated that he is able to take "really good care" of himself. (TR. 261). Plaintiff also reported to Dr. Symes that he hoped to be rehired by a previous employer. (TR. 225).

This combination of daily living activities and contradictory medical evidence amounts to substantial evidence supporting the ALJ's finding that the Plaintiff was not entirely credible.


## VI.  RECOMMENDATION.

Based on the foregoing, it is recommended that the Plaintiff's appeal be **DENIED**.


<u>s/ Malachy E. Mannion</u>
**MALACHY E. MANNION**
**United States Magistrate Judge**


**Dated:** January 22, 2007

O:\shared\REPORTS\2006 Reports\06-0110.01.wpd

22